# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| MARDI COMBS-HARTSHORN, | ) |
| Plaintiff, | ) |
| | ) No. 05 C 2872 |
| v. | ) |
| | ) Judge John W. Darrah |
| TIM BUDZ, JOE DORSEY, | ) |
| DOUG COLLINS, JACK GRAHAM, | ) |
| ANGELA BRATCHER, | ) |
| KENNETH DUNN, | ) |
| TARRY WILLIAMS, | ) |
| DAVID SWAFFORD, and | ) |
| LINDA DUNN, | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Mardi Combs-Hartshorn ("Combs"), pursuant to 42 U.S.C. §§ 1983, 1985 and 1988, brings suit against Defendants Tim Budz, Joe Dorsey, Doug Collins, Jack Graham, Angela Bratcher, Kenneth Dunn and Tarry Williams ("the State Defendants"), in their official and individual capacities, and against Defendants David Swafford and Linda Dunn, in their individual capacities. Combs, in her Third Amended Complaint, alleges violation of the First Amendment (Count I), violation of the Equal Protection Clause of the Fourteenth Amendment (Counts II, III, VII and VIII), violation of the Due Process Clause of the Fourteenth Amendment (Counts V and VI), conspiracy to violate the First and Fourteenth Amendments (Counts IV and IX), Malicious Prosecution (Counts X and XI), Interference with Employment Relations (Count XII), Intentional Infliction of Emotional Distress (Count XIII), Defamation (Count XIV), Civil Conspiracy (Counts XV and XVI), and violation of the Illinois State Officials and Employees Ethics Act. The State Defendants have moved for summary judgment on all counts.

**UNDISPUTED FACTS**

From May 2001 until June 2005, Combs was employed at the Sexually Violent Persons Treatment and Detention Facility in Joliet, Illinois ("the TDF"). (Defs.' 56.1(a)(3) at ¶ 6.) Combs was employed as a Security Therapy Aide ("STA").[1] (Defs.' 56.1(a)(3) at ¶ 6.) As an STA, Combs was responsible for maintaining the safety and security of TDF staff and residents. (Defs.' 56.1(a)(3) at ¶ 7.) Combs received special training related to her position, including takedown tactics, the use of handcuffs and mace, and how to maintain proper boundaries with the TDF residents. (Defs.' 56.1(a)(3) at ¶ 8.) Combs' training in this last category included keeping a good distance from residents, not letting oneself become too close to residents and not sharing personal information. (Defs.' 56.1(a)(3) at ¶ 8.)

In 2002, Plaintiff was working the second shift at the TDF, which ran from approximately 2:15 p.m. to 10:45 p.m. (Defs.' 56.1(a)(3) at ¶¶ 9, 10.) During that time, Combs met with Defendant Budz, the Facility Director at the TDF, about the behavior of Defendant Bratcher, an "STA II." (Defs.' 56.1(a)(3) at ¶¶ 4, 12.) Combs alleged that Bratcher spoke to her in a loud, commanding voice that Bratcher did not use with other employees. (Defs.' 56.1(a)(3) at ¶ 10.) Combs also complained to Budz that Bratcher was "riding her too hard" on the length of time she was spending engaging in conversation with particular residents, including TDF resident Jerry McCabe ("McCabe"). (Defs.' 56.1(a)(3) at ¶ 12.)

In early 2002, McCabe wrote letters to various government agencies concerning Combs and her employment at TDF. (Defs.' 56.1(a)(3) at ¶ 17.) In March 2002, in response to concern that Combs was over-involved with residents, including McCabe, Budz instructed Combs'

---

[1] Combs' last position at the TDF was STA-I. (Defs.' 56.1(a)(3) at ¶ 6.)

2

supervisors to assign her to a post at the front door of the TDF, where it was not necessary to interact with residents. (Defs.' 56.1(a)(3) at ¶¶ 11, 18.) The Illinois State Police conducted an investigation of Combs' relationship with McCabe, which resulted in Combs' receiving verbal and written counseling from Defendant Collins, an "Executive II" ("Exec II") at the TDF. (Defs.' 56.1(a)(3) at ¶¶ 4, 19, 20.) Plaintiff did not learn of the investigation until she asked why she had been placed at the front door for so long. (Defs.' 56.1(a)(3) at ¶ 19.)

For a few months in 2002, Combs worked the third shift, which runs approximately from 11:00 p.m. to 7:00 a.m. (Defs.' 56.1(a)(3) at ¶ 9.) Combs alleges that, while she was working the third shift, Defendant Dorsey, an Exec II, made sexual advances toward her. (Defs.' 56.1(a)(3) at ¶ 21.) Combs alleges that Dorsey rubbed up against her three times, grabbed her buttocks once, made comments regarding Combs' boyfriend and made a sexually suggestive comment. (Defs.' 56.1(a)(3) at ¶ 22.) Dorsey denies ever having any interactions of a sexual nature with Combs. (Defs.' 56.1(a)(3) at ¶ 24.)

In March 2003, Combs and approximately twelve other staff members at the TDF were served with subpoenas to testify in the civil commitment hearings of Brad Lieberman ("Lieberman"), a resident at TDF. (Defs.' 56.1(a)(3) at ¶¶ 25, 28.) Combs understood that she was called to testify in her capacity as an STA regarding her work at the TDF. (Defs.' 56.1(a)(3) at ¶ 26.) Combs understood that she would receive paid time off to testify and that the TDF would provide her with transportation to the hearing. (Defs.' 56.1(a)(3) at ¶ 26.) Budz, along with legal counsel and possibly Collins and Defendant Graham, also an Exec II, held a meeting for the TDF staff who had received the subpoenas. (Defs.' 56.1(a)(3) at ¶ 27.) The purpose of

3

the meeting was to help the staff to understand what a subpoena was, what they could expect and what it was going to be like to be questioned, to review confidentiality laws and for the staff to be introspective regarding why a resident would ask them to testify. (Defs.' 56.1(a)(3) at ¶ 27.)

At the staff shift-briefing following the receipt of the subpoenas, Collins stated that he was concerned about the relationships between staff and residents and why a staff member would be subpoenaed to testify for a resident. (Defs.' 56.1(a)(3) at ¶ 30.) In that briefing, Graham told the STAs that when testifying at the hearing, they should "tell them what you do while you're here . . . just that you're [an STA] here . . . you've dealt with [Lieberman] day in and day out on a daily basis. And tell them how you feel . . . ." (Defs.' 56.1(a)(3) at ¶ 31.)

No one in the TDF management told Combs that she was not to discuss the conditions of the facility, and she does not recall management telling her that she was not to talk badly about the facility. (Defs.' 56.1(a)(3) at ¶ 29.) Combs did not share anything about her potential testimony with either Graham or Collins. (Defs.' 56.1(a)(3) at ¶ 32.) Combs did not have any conversations with Budz about her testimony. (Defs.' 56.1(a)(3) at ¶ 33.) Budz had no knowledge of how Combs would testify at the hearing. (Defs.' 56.1(a)(3) at ¶ 33.) Budz never threatened Combs, nor did he instruct any other TDF employee to threaten her. (Defs.' 56.1(a)(3) at ¶ 33.)

The Lieberman hearing, which was set for April 13, 2003, was continued until February 15, 2006, at which time Combs testified. (Defs.' 56.1(a)(3) at ¶ 35.) After April 13, 2003, Combs does not recall having any conversations with anyone at the TDF about the hearing, her testimony, or the subpoenas. (Defs.' 56.1(a)(3) at ¶ 36.) In April 2003, when Combs was initially going to testify in the Lieberman hearing, it was not her intention to disclose

any violations of law or violations of any regulations by the TDF. (Defs.' 56.1(a)(3) at ¶ 37.) However, she did intend to testify about the poor treatment of residents and bad conditions at the TDF. (PX 31.)

On May 13, 2003, Defendant Williams, an "Internal Security Investigator I" at the TDF ordered a shakedown of the room of Defendant Swafford, a resident at the TDF. (Defs.' 56.1(a)(3) at ¶¶ 38, 39.) Williams' job duties included investigating residents and staff complaints under the direction of the facility directory. (Defs.' 56.1(a)(3) at ¶ 38.) Williams ordered the shakedown because he had received information that Swafford may have hidden a cell phone in his room. (Defs.' 56.1(a)(3) at ¶ 39.) During the shakedown, a Motorola Nextel cell phone was discovered. (Defs.' 56.1(a)(3) at ¶ 39.)

Following the discovery of the cell phone, Williams interviewed Swafford in the presence of Graham. (Defs.' 56.1(a)(3) at ¶ 40.) Swafford at first denied the allegation that he had a cell phone but, upon further questioning, admitted that Combs had brought the cell phone to him. (Defs.' 56.1(a)(3) at ¶ 41.) Williams reported this information to Budz, who instructed Williams to contact the Illinois State Police "ISP" for further guidance because the misconduct involved potentially criminal acts. (Defs.' 56.1(a)(3) at ¶ 43; Pl's 56.1(a)(3) at ¶ 21.) Williams contacted Lieutenant Brouk of the ISP, who informed Williams that ISP would take over the investigation and instructed that Combs should be placed on leave immediately. (Defs.' 56.1(a)(3) at ¶ 44.) Combs was placed on leave upon her arrival at work on May 13, 2003. (Defs.' 56.1(a)(3) at ¶ 46.) A few days after the discovery of the cell phone, Swafford informed Williams that he had

another phone hidden in his room. (Defs.' 56.1(a)(3) at ¶ 45.) The second phone, a Startac cell phone, was turned over to Williams, who informed the ISP of the discovery. (Defs.' 56.1(a)(3) at ¶ 45.)

The ISP investigation of incident was assigned to Defendant Sergeant Dunn, a Special Agent with the ISP. (Defs.' 56.1(a)(3) at ¶ 47.) Sergeant Dunn interviewed Swafford at the TDF on May 19, 2003, in the presence of ISP Special Agent Anthony Zurek. (Defs.' 56.1(a)(3) at ¶ 48.) Swafford told Sergeant Dunn that Combs brought him the Nextel cell phone and that he had subsequently used the phone to speak with Combs. (Defs.' 56.1(a)(3) at ¶ 49.) Swafford stated that before Combs had given him the Nextel phone, he had obtained the Startac phone from another TDF employee nearly a year prior. (Defs.' 56.1(a)(3) at ¶ 51.) Swafford stated that after Combs caught him using the Startac phone, she gave him her telephone number and asked him to call her. (Defs.' 56.1(a)(3) at ¶ 51.)

Swafford stated that Combs suggested that he purchase the Nextel phones after Swafford told Combs that it was too expensive to continue to use his Startac phone to call her. (Defs.' 56.1(a)(3) at ¶ 52). Swafford stated that his wife, Defendant Linda Dunn, purchased two Nextel cell phones at Swafford's request. (Defs.' 56.1(a)(3) at ¶ 49.) Swafford stated that he arranged to have Combs pick the phones up from the store and that Combs kept one of the two phones so that he and Combs could communicate. (Defs.' 56.1(a)(3) at ¶ 49.) Swafford's wife, Linda Dunn, purchased the phones on or about March 26, 2003. (Defs.' 56.1(a)(3) at ¶ 50.) Swafford told Linda Dunn that another individual, whose wife was a social worker who would speak to Swafford in the evenings, would pick up the phones. (Defs.' 56.1(a)(3) at ¶ 50.)

On June 5, 2003, Sergeant Dunn and ISP Sergeant Edward Gonzalez interviewed Maureen Devlin, a sales representative for KC wireless, a cellular telephone company. (Defs.' 56.1(a)(3) at ¶ 54.) Devlin provided a copy of a cellular contract and other purchasing documents that showed that Linda Dunn had purchased the cellular phones and that Combs picked them up, each using their respective driver's licenses. (Defs.' 56.1(a)(3) at ¶ 55.) On July 31, 2004, Sergeant Dunn and ISP Special Agent Brad Maurer interviewed Linda Dunn. (Defs.' 56.1(a)(3) at ¶ 56.) Linda Dunn stated that Swafford asked her to purchase two cellular phones in March 2003 so that he could make calls to someone regarding a treatment program. (Defs.' 56.1(a)(3) at ¶ 56.) Linda Dunn purchased the phones at KC wireless and told the sales representative that someone else would pick up the phones. (Defs.' 56.1(a)(3) at ¶ 57.) Linda Dunn had never met Combs. (Defs.' 56.1(a)(3) at ¶ 58.) When she purchased the phones, she did not know who would pick them up, other than it would be an employee of the TDF. (Defs.' 56.1(a)(3) at ¶ 58.) Sergeants Dunn and Gonzalez were scheduled to interview Combs on August 12, 2003; but Combs decided not to attend the interview. (Defs.' 56.1(a)(3) at ¶ 59.)

Sergeant Dunn served subpoenas to obtain relevant cellular phone records. (Defs.' 56.1(a)(3) at ¶ 62.) The two Nextel phones purchased by Linda Dunn were assigned numbers 815-530-6307 and 815-530-6308. (Defs.' 56.1(a)(3) at ¶ 63.) The cell phone Swafford had in his possession had the 6307 number, and the phone Swafford claims Combs retained had the 6308 number. (Defs.' 56.1(a)(3) at ¶ 64.) Swafford's Startac phone had the number 618-322-9287. (Defs.' 56.1(a)(3) at ¶ 65.) Combs' personal cell phone had the number 815-791-8127. (Defs.' 56.1(a)(3) at ¶ 65.) After Sergeant Dunn had obtained all of the relevant cellular phone records, a Division of Internal Investigation Criminal Intelligence Analyst compiled and charted

the telephone numbers, resulting in a detail of the calls that were made between Combs and Swafford. (Defs.' 56.1(a)(3) at ¶ 67.) The Nextel phone with the 6308 number was used to call Combs' home telephone number and Combs' family members. (Defs.' 56.1(a)(3) at ¶ 69.) Phone records indicated that Swafford had used his Startac phone to call the home of Combs a total of twenty-two times for a total of over 476 minutes. (Defs.' 56.1(a)(3) at ¶ 70.) Phone records for Plaintiff's personal cellular phone listed a total of sixty-two calls, totaling 653 minutes, to Swafford's Startac phone. (Defs.' 56.1(a)(3) at ¶ 71.)

On August 13, Sergeant Dunn contacted Will County State's Attorney Ken Zelazo, who instructed Sergeant Dunn to submit a summary of the case. (Defs.' 56.1(a)(3) at ¶ 60.) Zelazo told Sergeant Dunn that the case would be presented to the Will County Grand Jury for indictment. (Defs.' 56.1(a)(3) at ¶ 60.) It was the decision of the Office of the State's Attorney whether to proceed with criminal charges against Combs. (Defs.' 56.1(a)(3) at ¶ 61.)

Combs was arrested on January 30, 2004, while she was at the TDF. (Defs.' 56.1(a)(3) at ¶ 73.) Combs had come to the TDF at the request of Budz for a pre-disciplinary meeting as a result of her indictment by a grand jury for official misconduct. (Defs.' 56.1(a)(3) at ¶ 72.) Following the indictment, Budz placed Combs on "suspension pending judicial verdict," which changed her status from a paid employee to an unpaid employee. (Defs.' 56.1(a)(3) at ¶ 74.) The criminal charges against Combs were dismissed because the introduction of a cell phone into the TDF did not violate any existing statute because the TDF was not classified as a penal institution. (Defs.' 56.1(a)(3) at ¶ 75.)

After the criminal proceedings against Combs terminated, Williams obtained a copy of the ISP file from the State's Attorney's Office and, at the direction of Budz, began an administrative investigation of Combs' conduct. (Defs.' 56.1(a)(3) at ¶ 77.) Williams attempted to reach Combs to set up an interview with her. (Defs.' 56.1(a)(3) at ¶ 80.) However, Combs did not return his calls. (Defs.' 56.1(a)(3) at ¶ 80.) Williams interviewed Swafford on March 11, 2005. (Defs.' 56.1(a)(3) at ¶ 81.) On or about March 16, 2005, Williams drafted a confidential memorandum outlining all of the evidence obtained during both the ISP investigation and his own subsequent investigation. (Defs.' 56.1(a)(3) at ¶ 81.) Williams based his investigative findings on the interviews he conducted and the information in the ISP file, including the records of cell phone calls to and from Combs and Swafford. (Defs.' 56.1(a)(3) at ¶ 82.)

On March 22, 2005, Roen Isham, a Public Service Administrator for the TDF, sent a notice to Combs, informing her of a Pre-Disciplinary Meeting. (Defs.' 56.1(a)(3) at ¶ 102.) Combs responded by letter, stating that she would not attend because the Worker's Compensation Act prohibited her from returning to work without a doctor's release. (Defs.' 56.1(a)(3) at ¶ 102.) On April 1, 2005, Isham wrote back to Combs, telling her that she was not directing Combs back to work; rather, it was her option to appear at the meeting. (Defs.' 56.1(a)(3) at ¶ 103.) On April 20, 2005, the Pre-Disciplinary Meeting was held in Combs' absence. (Defs.' 56.1(a)(3) at ¶ 104.) A memo from Isham, dated April 20, 2005, indicates that Combs was aware that the Pre-Disciplinary Meeting was held in her absence and that she was going to be discharged from the TDF. (Defs.' 56.1(a)(3) at ¶ 105.) Following the Pre-Disciplinary Meeting, the opinion of management was that Combs should be discharged for

9

conduct including, but not limited to: breaching TDF security by providing a Nextel cell phone to Swafford, accepting numerous cell phone calls from Swafford, contacting Swafford by phone, failing to report that Swafford had a cell phone, failing to participate in an official investigation of the incident and engaging in conduct unbecoming a State employee by providing a resident of the TDF with personal information about herself. (Defs.' 56.1(a)(3) at ¶ 108.)

Combs denies having telephone conversations with Swafford. (Defs.' 56.1(a)(3) at ¶ 83.) Combs alleges that another individual or individuals set her up by making the cell phone calls that are attributed to her personal cell phone and to the cell phone that Swafford claims he purchased for her. (Defs.' 56.1(a)(3) at ¶ 83.) Combs alleges that her car was "keyed" and dented in February 2003 while in the TDF parking lot and that subsequently she could not locate her cell phone. (Defs.' 56.1(a)(3) at ¶ 85.) After Combs observed damage to her car and noticed she could not find her cell phone, she did not file a police report. (Defs.' 56.1(a)(3) at ¶ 87.) Combs alleges that one week after the incident, her cell phone reappeared in her vehicle; at which time, Combs continued regular use of her cell phone and kept the same number. (Defs.' 56.1(a)(3) at ¶ 86.) Combs did not file a police report after the incident. (Defs.' 56.1(a)(3) at ¶ 87.)

In her Complaint, Combs alleges that Bratcher "[stole] Plaintiff's original cell phone and driver's license" and "provided that phone and license to [Linda] Dunn, who used Plaintiff's phone to call Swafford . . . and used Plaintiff's license to pick up the cellular phones from the cellular store." (Defs.' 56.1(a)(3) at ¶ 88.) Combs speculates that Bratcher took her phone because she did not want Combs to work at the TDF and that Bratcher could have taken a copy of Combs' license out of her personnel file, as Combs does not know for sure if her license was

10

ever missing from her car. (Defs.' 56.1(a)(3) at ¶ 89.) Combs has no testimonial or physical evidence to support either of these theories. (Defs.' 56.1(a)(3) at ¶ 89.)

Combs claims that Budz was "part of a scheme between Swafford and Bratcher with the cell phones." (Defs.' 56.1(a)(3) at ¶ 90.) Combs is unsure why Budz would want to get rid of her. (Defs.' 56.1(a)(3) at ¶ 90.) Combs has no evidence that Bratcher gave Combs' cell phone or driver's license to Linda Dunn or that Linda Dunn used Combs' cell phone to call Swafford. (Defs.' 56.1(a)(3) at ¶ 91.) Combs has no evidence that Swafford ever talked to Budz, Collins, Graham or Williams about framing Combs. (Defs.' 56.1(a)(3) at ¶ 92.) Combs has no evidence that Budz had anything to do with the alleged damage or break-in to her car or with Swafford obtaining the cell phones. (Defs.' 56.1(a)(3) at ¶ 93.) Dorsey was never questioned, nor did he engage in any conversation concerning the cell phones found in the possession of Swafford. (Defs.' 56.1(a)(3) at ¶ 100.) Nor did Dorsey have any conversation with any STA concerning Combs or Swafford and the cell phone incident. (Defs.' 56.1(a)(3) at ¶ 100.) Linda Dunn testified that she has never met with Budz and does not know Dorsey, Collins, Graham, Bratcher or Williams. (Defs.' 56.1(a)(3) at ¶ 101.)

Combs is not aware whether Budz discussed the investigation into the cell phones or Combs' subsequent termination with anyone outside the TDF. (Defs.' 56.1(a)(3) at ¶ 95.) When Combs was arrested, Budz did not contact any newspaper or other entity outside the TDF. (Defs.' 56.1(a)(3) at ¶ 96.) Budz never discussed the investigation, arrest, prosecution or termination of Combs with anyone, except as necessary to perform his duties as Facility Director. (Defs.' 56.1(a)(3) at ¶ 96.)

11

## LEGAL STANDARD

Summary judgment is appropriate when there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Thus, although the moving party on a motion for summary judgment is responsible for demonstrating to the court why there is no genuine issue of material fact, the non-moving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate, through specific evidence, that there remains a genuine issue of material fact and show that a rational jury could return a verdict in the non-moving party's favor. *Celotex*, 477 U.S. at 322-27; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-56 (1986) (*Anderson*); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (*Matsushita*); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994). Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992). When reviewing a motion for summary judgment, a court must view all inferences to be drawn from the facts in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 247-48; *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999). However, a metaphysical doubt will not suffice. *Matsushita*, 475 U.S. at 586. If the evidence is merely colorable or is not significantly probative or is no more than a scintilla, summary judgment may be granted. *Anderson*, 477 U.S. at 249-250.

## ANALYSIS

### *First Amendment Claim - Count I*

Combs claims that Defendant Budz violated her right under the First Amendment by placing her on administrative leave in retaliation for Combs' intention to testify truthfully under the subpoena at the Lieberman hearing. To establish a First Amendment retaliation claim, Combs must show that her speech was constitutionally protected and that Budz retaliated against her because of that speech. *See Button v. Kibby-Brown*, 146 F.3d 526, 529 (7th Cir. 1998). Defendants do not dispute that Combs' testimony at the hearing was constitutionally protected speech. However, they argue that Combs cannot show that Budz retaliated against Plaintiff due to her planned testimony.

In her response to Defendants' motion, Combs states: "Budz made it clear to Combs that she was to testify to Lieberman's having bad character. Collins and Graham conferred with Budz, their supervisor, about Combs' subpoena, and then told Combs to lie about Lieberman or face consequences." However, the Local Rule 56.1 statements that Combs cites do not support these allegations. Specifically, there is nothing in the statements to show that Budz spoke with Combs about the subpoena, that Collins and Graham conferred with Budz about Combs or that Collins or Graham told Combs to lie at the hearing or threatened retaliation if she told the truth. To the contrary, Combs did not deny Defendants' Local Rule 56.1 statement that "[Combs] did not have any conversations with Budz about her testimony in the hearing, Budz had no knowledge of how [Combs] would testify at the hearing, and Budz never threatened [Combs], nor did he instruct any other employee to threaten her."

Thus, Combs has offered no evidence demonstrating that Budz placing her on administrative leave was in any way related to her planned testimony at the Lieberman hearing. Combs has therefore failed to raise a genuine issue of fact with respect to the second element of her claim, that she suffered retaliation because of her constitutionally protected speech. Defendants' motion for summary judgment on Count I is, therefore, granted.

*Equal Protection Claims - Counts II, III*

In Counts II and III of her Complaint, Combs alleges that Defendants Graham and Collins deprived Combs of her rights under the Equal Protection Clause of the Fourteenth Amendment by threatening her with termination for answering the subpoena while not threatening similarly situated males who were required to answer the subpoena. To establish a claim for discrimination under the Equal Protection Clause, Combs must show that (1) she is a member of a protected class, (2) she was similarly situated to members of an unprotected class, (3) she was treated differently than members of the unprotected class, and (4) that Defendants acted with discriminatory intent. *See Johnson v. City of Fort Wayne*, 91 F.3d 922, 944-45 (7th Cir. 1996).

Combs bases her charges of discrimination on her assertion that "Defendants Graham and Collins directed comments towards [Combs] implying that any negative testimony about the TDF at the Lieberman hearing would bring retaliation." These comments consisted of a single exchange between Graham and Collins in which they said to each other, "That's how you get yourself in trouble, being close to residents. If you weren't so close to the residents that wouldn't happen to you." Combs has admitted that she does not know if this comment was directed at her. Combs also alleges, without further detail or explanation, that a second meeting called by Collins, attended by Combs, Budz and others, "served to further intimidate Combs."

14

Combs falls short in her attempt to prove her Equal Protection claims against Graham and Collins. First, Combs has offered no material evidence to show that she was treated differently than any other employee at the TDF with regard to the subpoenas for the Lieberman hearing. The single comment between Graham and Collins regarding the shortcoming of a close relationship between residents and staff cannot reasonably support an inference of threatened retaliation. This is especially true because Combs herself was unsure whether the comment was directed at her. With respect to the second meeting, Combs points to no specific conduct by Graham or Collins and relies instead on her conclusory unsupported statement that she felt intimidated.

But even if Combs could show that she had been treated differently than similarly situated male employees, Combs has not even attempted to show that Defendants acted with discriminatory intent. Combs has offered no evidence to show that her gender was a factor in any action taken by Graham or Collins. Combs has not even alleged that it was a factor.

Combs attempts to bypass this latter problem by attempting to proceed on a "class of one" theory. In order to succeed under such a theory, Combs must show that she was "(1) intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment or (2) that the government is treating unequally those individuals who are *prima facie* identical in all relevant respects, and that the cause of the differential treatment is a totally illegitimate animus toward the plaintiff by the defendant." *Nevel v. Village of Schaumburg*, 297 F.3d 673, 681(7th Cir. 2002) (citing *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir.2001)).

15

The "class of one" equal protection theory is typically pursued when a government official has taken action against a private citizen with no conceivable basis for his action other than spite or some other improper motive. *Lauth v. McCollum*, 424 F.3d 631, 633 (7th Cir. 2005) (*Lauth*). The theory is disfavored in suits by public employees because it changes the terms of employment at will and "inject[s] the federal courts into an area of labor relations that Congress disclaimed a federal interest in." *Lauth*, 424 F.3d at 633 (noting that the court had found no "class of one" cases in which a public employee has prevailed). As noted above, Combs' only basis for her equal protection claim is that she was present when Graham and Collins made a single comment, which Combs viewed as a veiled threat, although Combs admits that she was not even sure that the comment was directed at her. This will not support an equal protection claim, let alone the "class of one" equal protection claim requirement that the comment resulted from "totally illegitimate animus" toward Combs on the part of Graham and Collins.

Therefore, because Combs has offered no evidence that Defendants Graham and Collins discriminated against her, Defendants' motion for summary judgment on Counts II and III is granted.

*Conspiracy Claim - Count IV*

Combs alleges that Defendants Graham and Collins conspired to deprive her of her rights under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment by restricting Combs' right to answer truthfully under the subpoena. To establish a claim for civil conspiracy under § 1985(3), a plaintiff must demonstrate (1) the existence of a conspiracy, (2) a purpose of depriving a person or class of persons of equal protection of the laws, (3) an act in

16

furtherance of a conspiracy, and (4) an injury to person or property or a deprivation of a right or privilege granted to U.S. citizens. *Green v. Benden*, 281 F.3d 661, 665 (7th Cir. 2002).

Here, Combs has not offered any evidence supporting either the first or second requirement. First, Combs offers no direct evidence that Graham and Collins ever discussed Combs' testimony or the subpoena. Combs points to what she characterizes as differing recollections about what was discussed at a meeting between Collins, Graham and Budz as evidence that there was a "meeting of the minds." However, this is no more than speculation on the part of Combs. Furthermore, Combs cannot meet the second requirement that the purpose of the conspiracy was to deprive a person or class of persons of equal protection of the laws. The statute requires that there "must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). Here, there is not even the suggestion that Defendants took any action against Combs because of her gender.

Therefore, Defendants' motion for summary judgment on Count IV is granted.

*Fabrication of Evidence - Counts V, VI, VII, VIII, IX*

Combs alleges that Defendants Budz and Sergeant Dunn violated Combs' due process and equal protection rights by fabricating evidence and that Budz and Sergeant Dunn conspired together to violate those rights. Combs also alleges that Defendants Budz, Swafford, Linda Dunn, Bratcher, Collins, Dorsey and Graham conspired to fabricate evidence against Combs. Combs' theory is based on her contention that she did not give a Nextel cell phone to Swafford and that she did not use that phone or any other phone to communicate with him. Rather, Combs claims she was set up by Defendants Budz, Bratcher and others.

Combs is unable to support her allegations. Combs admits that she has no physical evidence to prove her theory. She admits that her theory is based entirely on speculation. Furthermore, Combs is unsure why Defendant Budz would want to set her up. By contrast, the version of events set out by Defendants is well corroborated by voluminous evidence. Swafford stated that Combs gave him the Nextel phone. Combs' driver's license was on file at the store where the Nextel phones were purchased. Phone records indicate that the Nextel phone not in the possession of Swafford was used to call Combs' home and family members. Those records also indicate that calls were made on Combs' personal cell phone to the Startac phone found in Swafford's possession.

Combs' attempts to explain this evidence are not credible. Combs' theory that Defendant Bratcher stole her cell phone and driver's license in an attempt to set her up presupposes extensive and sophisticated collaboration between people with little previous connection, many of whom had no reason to wish Combs ill. Combs' theory also does not fully explain the incriminating phone records, including the calls from the second Nextel phone to Combs' home and family members. In short, Combs' speculation that Defendants fabricated evidence is controverted by every piece of relevant evidence in this case. No rational jury could return a verdict in favor of Combs on these claims.

As a final matter on these allegations, Combs' claims against Sergeant Dunn are based partly on Combs' view that Dunn failed to adequately investigate the case. Combs claims that among other shortcomings, Sergeant Dunn never interviewed several employees at the TDF, did not obtain a search warrant for Combs' residence to search for the second Nextel phone, did not obtain cell tower records to determine the location of the second Nextel phone, and did not turn

the Nextel phone over to the ISP Forensic Labs. However, it is not the duty of the police to perform a perfect investigation. *Nugent v. Hayes*, 88 F.Supp.2d 862, 868 (N.D. Ill. 2000). Given the solid case he had already assembled, Sergeant Dunn could not have been expected to devote more of the ISP's not-unlimited resources to gathering superfluous evidence.

Therefore, because Combs presents no evidence beyond her own speculation that Defendants in any way fabricated evidence against her, Defendants' motion for summary judgment on Counts V, VI, VII, VIII and IX is granted.

*State Law Claims*

Combs' claims in Counts X-XVII are claims under state law. Jurisdiction over those claims is based on 28 U.S.C. § 1367(a). Here, all of Combs' claims under federal law have been dismissed. Therefore, Combs' state-law claims, Counts X-XVII, are dismissed pursuant to 28 U.S.C. § 1367(c). *See NLFC, Inc. v. Devcom Mid-America, Inc.*, 45 F.3d 231, 237 (7th Cir. 1995) (if all federal claims are dismissed before trial, the district court may pendant state-law claims).

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted with respect to Counts I-IX. Counts X-XVII are dismissed pursuant to 28 U.S.C. § 1367(c).

Dated: June 12, 2008

JOHN W. DARRAH
United States District Court Judge